PEOPLE ex rel. MEEKER v. BAKER, Police Com'r.

(Supreme Court, Appellate Division, First Department. February 3, 1911.)

1. EXTRADITION (§ 30*)—INTERSTATE—PERSONS SUBJECT TO EXTRADITION—FUGITIVE FROM JUSTICE.

   To justify extradition of a fugitive from justice, the prisoner must have been physically present in the demanding state at the time of the commission of the alleged offense, and extradition will not be granted on the theory of a constructive presence.

   [Ed. Note.—For other cases, see Extradition, Cent. Dig. § 32; Dec. Dig. § 30.*]

2. EXTRADITION (§ 32*)—INTERSTATE—INDICTMENT—SUFFICIENCY.

   The sufficiency of an indictment to charge a crime justifying extradition is determined solely by the courts of the demanding state.

   [Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 36–38; Dec. Dig. § 32.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. EXTRADITION (§ 39*)—INTERSTATE—FUGITIVE FROM JUSTICE.
     Where there was evidence that accused, charged with conspiracy, committed on or about a designated date in Texas, had been in Texas a few days before the designated date, and he admitted making the drafts by means of which the conspiracy was committed, and receiving money from a coconspirator therefor, there was sufficient proof that he was a fugitive from justice to justify his extradition to Texas.
     [Ed. Note.—For other cases, see Extradition, Dec. Dig. § 39.*]

Appeal from Special Term, New York County.

Application for writ of habeas corpus by the People, on the relation of Charles M. Meeker, against William F. Baker, Police Commissioner of the City of New York. From an order dismissing the writ and remanding relator to custody, he appeals. Affirmed.

See, also, 139 App. Div. 471, 124 N. Y. Supp. 47.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, MILLER, and DOWLING, JJ.

George P. Breckinridge, for appellant.
Robert S. Johnstone, for respondent.

DOWLING, J.   The relator was indicted by the grand jury of Dallam county, Tex., at the March, 1910, term of the district court of said county, for a common-law conspiracy claimed to have been entered into by him on or about January 26, 1910, with W. H. Richey and H. L. Perkins, to defraud George N. Mattingly out of the sum of $2,400.   Briefly stated, the scheme into which these three parties were charged to have entered was that Perkins was to locate himself in London, England, and advertise himself as president and general manager of the London Commercial Banking Company, S. A., and represent to the public that the company was incorporated for $1,-000,000, with paid-up capital to that amount, and was a solvent and reliable banking institution; that Meeker was to make, execute, and draw drafts and checks on said company, and indorse and deliver the same to Richey; and that Richey would sell the same to Mattingly upon representations that the company was solvent, and had a paid-up capital of $1,000,000 and that Meeker and Richey each had large sums of money on deposit therein, subject to the payments of said drafts and checks, such deposits amounting to not less than $2,400; that Richey would request Mattingly to communicate by cable with said company, whereupon Perkins would verify the statement made by Richey; that all of such statements and representations made in pursuance of the conspiracy were false and untrue.

It was charged in the indictment that the conspiracy was actually accomplished by means of four drafts or bills of exchange made by Meeker to his own order aggregating £500, and indorsed and delivered by him to Richey and by Richey turned over to Mattingly, whereupon the latter, having received the cablegram from Perkins theretobefore agreed upon and having been shown by Richey a cablegram purporting to have been sent to Meeker by the company stating that the drafts were good, paid over to Richey in pursuance to said conspiracy the said sum of $2,400 in return for said drafts, which

of course were never honored. It was further charged in the indictment that the conspiracy in question was entered into in the county of Dallam, state of Texas, and that the sum of $2,400 was paid over by Mattingly to the conspirators in said county.

The relator being in the state of New York when the indictment was found, application was duly made by the Governor of the state of Texas to the Governor of the state of New York for the rendition of the relator as a fugitive from justice. Upon that application a hearing was had for the purpose of determining whether as a matter of fact the relator was a fugitive within the meaning of the extradition laws, the Governor being called upon to determine that as a question of fact. Ex parte Reggel, 114 U. S. 642, 5 Sup. Ct. 1148, 29 L. Ed. 250; Roberts v. Reilly, 116 U. S. 84, 6 Sup. Ct. 291, 29 L. Ed. 544. That question depended for its solution upon whether the relator was physically present in the state of Texas at the time of the commission of the alleged crime (People ex rel. Corkran v. Hyatt, 172 N. Y. 176, 64 N. E. 825, 60 L. R. A. 774, 92 Am. St. Rep. 706, affirmed 188 U. S. 691, 23 Sup. Ct. 456, 47 L. Ed. 657); for extradition will not be granted on the theory of a "constructive presence" (Munsey v. Clough, 196 U. S. 364, 25 Sup. Ct. 282, 49 L. Ed. 515). After the hearing had been concluded, the Governor determined as a matter of fact that the relator had been within the state of Texas at the time of the acts complained of, and was a fugitive from justice within the meaning of the law; and therefore he issued his warrant for the relator's arrest and surrender to the state of Texas. The warrant was directed to the Police Commissioner of the city of New York, and the relator, having been taken into custody thereunder, sued out a writ of habeas corpus, as the return to which the Police Commissioner returned the Governor's warrant as the cause of detention. This return was traversed by the relator, who denied that he was a fugitive from justice of the state of Texas, and averred that he was not within the said state on the 26th day of January, 1910, the day mentioned in the indictment. The writ having been dismissed, the present appeal is taken from such dismissal.

The sufficiency of the indictment against the relator is attacked, but it seems well settled that its sufficiency as a charge of crime is a question to be determined solely by the courts of the demanding state. "It is believed that there is no case in which a court has on habeas corpus discharged a fugitive from custody on a rendition warrant on the ground that an indictment accompanying the requisition did not constitute or contain a sufficient charge of crime." Moore on Extradition, vol. 2, p. 1030; People ex rel. Hamilton v. Police Com'r, 100 App. Div. 483, 91 N. Y. Supp. 760; Pierce v. Creecy, 210 U. S. 404, 28 Sup. Ct. 714, 52 L. Ed. 1113.

The Governor of the state of New York, being called upon to satisfy himself that the person demanded is a fugitive from justice, so determined after a hearing at which the following facts appeared: The relator admitted that he knew Perkins and Richey, and testified that in January, 1910, he resided with his family in the borough of

Brooklyn, city of New York, where he had lived for nearly two years, having formerly been a resident of Boston and some 10 years before a resident of Texas. On January 15, 1910, he left New York City on a Western trip, in the course of which he went to visit Richey, with whom he had been acquainted for some two years, and who then lived at Clayton, N. M. The day of his arrival at Clayton he fixes as Monday, January 25th, and while he was there he spent some time in conversation with certain people who had property and were going to engage in an enterprise of some kind. While there he went to a ranch in New Mexico, owned by one Evans, situated some seven or eight miles from Clayton. He spent four days in all in that state. He denied that he had ever been in the state of Texas during that trip, or that he had ever gone to Texline, Tex., or met any one there. It appears that Texline, where the transactions complained of took place, is just over the New Mexico border, in the state of Texas, the distance from Clayton being about ten miles. On cross-examination, he was shown a memorandum book kept by him in his own handwriting, wherein he made entries from day to day, showing his movements during his trip. Therein was an entry under date of Friday, January 22, 1910, in part as follows:

"Ar. Clayton 2 a. m., Hotel Elkland. For room and breakfast W. S. R., paid for it, and took me to his house with baggage. Drove to Texline, Tex., a. m."

He stated that when he was in Clayton he talked with Mr. Richey and other parties with reference to the organization of a bank there, and these drafts in question were issued for the purpose of being discounted and receiving money to organize the bank; that was his understanding of the situation. He said to Richey that he (Meeker) would have to have them indorsed to satisfy his bank. He thought that the entry in his book might be incorrect, because they were driving to look at land, and they were out toward the Texas line, perhaps near it; but not being familiar with the exact line he did not know whether he had actually reached it or not.

Affidavits on behalf of the state of Texas were presented to the Governor, including those of W. J. Clark, postmaster at Dalhart, Dallam county, Tex., C. S. Bingham, and D. W. Smith, both of the same place, all of whom swore that Meeker was in Dalhart, Tex., on January 22d.

C. T. Toombs stated that on January 24, 1910, he had an interview with Richey wherein the latter, who was his tenant, said that he and Meeker had just come from or were just going to Texline to raise money through the bank there, and that he would soon have the money with which to pay the rent. Meeker denied this, although he admits that he was present at a conversation between Toombs and Richey when Toombs demanded his rent.

R. S. Miller, who was personally acquainted with both Richey and Meeker, swore that on January 22, 1910, Richey said to him in Meeker's presence and hearing that he and Meeker had just been down to Texline, Tex., and Meeker did not deny the statement. All of these statements in the various affidavits are denied by Meeker.

Bernard McConville, a police officer of this city, testified that he made the arrest of the relator and saw him searched and the memorandum book referred to taken from his possession. Relator declined, at first, to make any statement in the absence of his attorney; whereupon Walter S. Russell, a private detective, asked him, "Are you aware that Mr. W. S. Richey has been arrested down in Texline for presenting these drafts on the Bank of Texline?" To this the relator replied:

"I know all about that; I was present with Mr. Richey. It was a perfectly legal transaction, and Mr. Richey will be prepared to fill his contract and meet any drafts given by them to help carry out the transactions if they will only have patience."

Walter H. Russell testified that relator said to him after his arrest that he knew what happened, and that he was with Mr. Richey, and that these things would be met. Upon the hearing on the return to the writ of habeas corpus, the identity of the relator was proven, and the latter upon examination testified that on January 22d, the first day he was in Clayton, he had gone on a ride with Richey, inspecting property, in the course of which they passed through no towns of any consequence, but after the ride was nearly over, Richey asked him if he realized that he had been in a Texas city. It is plain from the purport of the questions and of the answers thereto, as well as from the affidavit of Richey, that this city was Texline.

Relator claimed that he did not leave the buggy at any time during the ride, and that he had no transactions with any bank in Texline during the time that he was there. On cross-examination he admitted drawing the drafts in question and giving them to Richey some time between January 22d and January 28th. For them he received from Richey $270 in cash, and a check which he finally recollected was drawn by George N. Mattingly on the Bank of Texline for an amount he could not remember, payable to Richey's order, indorsed to the relator, and by him sent to his office at 120 Liberty street, New York City. The affidavit of Richey was received in evidence, wherein he said that on January 22, 1910, he took Meeker driving in a buggy to give him a general idea of the country, and in the course of their drive they passed through the town of Texline, but neither of them alighted therein. Edith Richey swore that Meeker and Richey left on the drive in question and did not return therefrom until the afternoon. O. P. Esterwood swore that Mattingly had said to him on April 10, 1910, that he did not know Meeker, had never seen him at Texline, had never conversed with him, and if he was in Texline Mattingly did not know it to his own knowledge, although he believed he had some circumstantial evidence tending to show that Meeker had been in Texline in January, 1910. John W. Lanier swore that he saw relator in Clayton, N. M., on January 25, 1910, and went with him to Des Moines, N. M., in the afternoon of that day, Meeker returning the next afternoon. The only fair conclusion that can be drawn from all this testimony is that Meeker, although he had at first denied ever having been in Texline, and admitting

the same only after being confronted with his own diary, was actually in Texline, at least on January 22, 1910, if not on other occasions. He was with Richey in Texline at the time of the commission of the offenses in question and during the accomplishing of the purposes of the conspiracy, for the indictment is not limited to the date of January 26, 1910, but charges the commission of the offenses on or about that date. He admits making the drafts by means of which the fraud was committed and received money from Richey therefor, together with a check drawn by the party defrauded, which he mailed to his New York office. Upon these facts it seems clear that the writ was properly dismissed.

In the Matter of Hoffstot, the Governor of the state of New York had before him a requisition for the surrender of a person indicted for conspiracy on a specific date alleged in the indictment, being June 3, 1908. There was no proof that the person was within the state of Pennsylvania, the demanding state, on that date, but there was evidence that he had been within the state on May 28th. The Governor held that upon the trial the precise date alleged in the indictment would not be material, and that the state could prove the commission of the crime at a different date; that in conspiracy cases in particular, the proof was generally circumstantial, and consisted of various acts and circumstances from which the unlawful agreement constituting the conspiracy could be inferred, and that the proof ordinarily extended to acts committed through a considerable period of time, the precise date being frequently difficult to determine; he held that since Hoffstot was in the state of Pennsylvania during the period over which the conspiracy extended, and since there were circumstances justifying the inference that acts were committed while he was in the state of Pennsylvania, which might be considered to have had some relation to the conspiracy, he was extraditable. New York Law Journal, May 24, 1910.

In sustaining the decision of the Governor, Judge Holt said:

"The provision for the extradition of criminals is essential to the efficient administration of criminal justice. When an indictment and the requisition papers issued by the Governor of the demanding state are regular and sufficient upon their face, and when there is some evidence which, although not not of a very satisfactory kind, is sufficient to satisfy the Governor of the surrendering state, and he has issued his warrant for extradition, it is well settled that the judiciary should not interfere on habeas corpus and discharge the prisoner upon technical grounds unless it is clear that the Governor's action in issuing the warrant plainly contravenes the law." Ex parte Hoffstot (C. C.) 180 Fed. 240.

The order appealed from must therefore be affirmed, with costs. All concur.